Good morning. Good morning, Your Honor. I should shorten this just a little. There we go. May I please? Let me just ask our clerk, as we really can't see the timer now, would you let me know, do you want to save any time or not? Yes, Your Honor, I'd like to save four minutes for rebuttal. Okay, I'll ask the clerk to notify me when we're at four minutes, okay, just so we can advise you. Thank you. Okay, thank you. May it please the Court, my name is Andre LaRose and I'm here representing Katie and her parents today. They have consented for us to use her first name in these proceedings today and her parents are here in the courtroom. Katie is unable to be here because she's 20 years old now and attending classes at a capable bright young woman and she was capable of high academic achievement while she was in school, but unfortunately she had some serious psychiatric disorders that interfered with that ability to learn, that ability to be in school. And one of the most critical issues here is that the school district, the Missoula County Public Schools, failed to identify her and evaluate her when there was ample basis to suspect that she had a disability by her age. Let me ask you to help me on this. I've dealt with a lot of these IDEA cases and just kind of laying out my perspective on this, it seems to me that with the exception of the child fine issue that the school district tried very, very hard to do its duty. The administrative hearing officer and the on the child find issue, they probably missed the ball. But there's a timing problem, is there not? That is the statute of limitations. Can you address that for me, please? In other words, let's assume for a moment that the school district inadequately discharged its responsibilities under the child find duty. Why is that claim not barred? Because it occurred too long before the barred, Your Honor, because the parents did not know and should not have known of the critical facts of the injury until until she was evaluated in 2013 and found. But with respect, counsel, I have no doubt these parents are loving parents. They love their daughter. They want the best for her, as does the court. But the very issues that were involved here, I think some of them asked for certain things to be done. I just I'm struggling with the idea that somehow the school district was supposed to know that, what do we call her, Katie or JK? Katie. Okay. That Katie had these issues and the parents didn't know. That kind of, it's hard, hard for me to understand. Actually, Your Honor, that's not correct. The parents did know and the school knew that what they didn't find out until she was a sophomore in high school is that she actually also had autism, formerly known as Asperger's, no intellectual impairment. But she was diagnosed with major depression, anxiety disorder, ADHD, nonverbal learning impairment. The parents knew this though, right? They knew that. Okay. So they knew that. And eventually the school district knew that and perhaps they failed in the child find area. Why? Why doesn't the statute of limitations come into play here? Because they did not know that she had an educational disability and because the child find obligation placed, it's so profound, it places that responsibility on the school district. It's affirmative, it's far-reaching and... Counsel, perhaps I'm reading the record in a different case, but I thought that the parents in this case had Katie in a private school beforehand or if they got to the public school, they were concerned all along, as loving parents would be, that their child had some serious problems. I thought they communicated many of those problems to the school district. Now there's some, just to be about what, when, where, all that sort of thing, but they knew. They were loving parents. Now the fact that the school district may not have known or the parents may not have known a precise medical definition, I don't think is the issue. The issue is she was having trouble. She was having trouble learning, having trouble interacting with people as anybody with what we used to call Asperger's has, but they knew that. Well, they knew she was having problems, but they didn't know that she had an educational disability and the school district is the professionals who should know that. You're not serious, are you? You want us to accept the fact that the parents didn't know that Katie was having trouble in school and having trouble learning. They knew she was having trouble in school. They did not know that she could qualify for special education services. They thought that was for children with severe physical and intellectual disabilities. That's different. But you're... What the remedy might be and what she might be entitled to is one thing. What I'm talking about is the fact that the parents were aware that she was having educational difficulties. Right, and under the precedent in this circuit, that is not enough. The Avila decision was decided while this case was pending. It adopts the approach by the Draper Court, the 11th Circuit, I believe, that says that parents do not know and should not have known until they gain information later that proves, that shows that what the district did was incorrect. And in those cases, the Draper case and others that were cited with approval by this court in Avila, those cases, three of them involved child fine violations. And those three said the parents did not know and should not have known until there was a later evaluation that revealed that that student did have an educational disability. In Draper, it's a little bit different, I believe, counsel. In Draper, the parents alleged an IDA violation caused by an initial mis-evaluation under the IDA and the, I guess, the diagnosis. I don't know if you remember what the diagnosis... A misdiagnosis and a misplacement, I believe. Of what kind of? What was the issue, though? I think they thought the student was intellectually impaired when, actually, it was a different type of disability. This case seems a bit different because, in this case, at least from the facts that you all have presented, Katie's had issues when she was in the first grade, if not before. Her parents had her see a mental health therapist. When she was in the first grade, she was diagnosed with ADHD. Her parents knew that. And another psychologist diagnosed Katie with a nonverbal learning impairment and mood disorder. And when she was in the fifth grade, a doctor prescribed some medication for her. So I'm just trying to figure out, but let's just, even with all of that, let's get to the ninth grade when she had the suicidal ideation. She had the suicidal ideation in sixth grade and in ninth grade. Okay. I'm sorry. That's okay, but... Either way. You're right. It was a suicidal ideation, but then she had a significant, where she was in the ninth grade? She was hospitalized in the sixth grade and the ninth grade. She expressed suicidal ideation at school in the sixth grade. The school officials called the parents. She went to a psychiatric hospitalization immediately. Then she was in a part-time school, part-time psychiatric hospital program. Let's use that date, okay? That was June 2010. I thought that was 2009. No, 2009 is when she started in the public school system at the beginning of sixth grade. In June of 2010, at the end of that grade, she had missed 223 classes. When was she hospitalized? She was hospitalized at the end of May, beginning of June 2010. Okay. And then she was hospitalized again in the fall of 2013 when she was a sophomore in high school. Okay. And so why didn't the parents, after that, bring a claim against the school? Again, it's because they had no idea. The educational disability definitions are very different from medical diagnoses. It says emotional disturbance is one of the issues. So, I mean, they clearly had to know that there was some emotional disturbance. How would they know? The school district has the affirmative obligation to find students who are homeless, who are wards of the state, and who are in private schools. And they... I'm sorry, Your Honor. Yeah. Both of them have, it looks like from the statute, have the responsibility to try to do something once they know something. I'm just trying to figure out, just practically, why did the parents wait? The handbook says, if you have questions about your child's eligibility for special education, talk to the That's all they knew to do. The handbook gives no clue that they have a right to request an evaluation. It doesn't give any idea what might qualify. Their perception of who special education was for did not include students with emotional disturbance or psychiatric diagnoses. I just, like I said, I mean, I have page after page of notes here that shows interaction with the parents and the school district about this young woman for years. And so the school district was obligated then to provide a notice of the procedural safeguards. What about the parents? The parents are responsible for their child, right? They are, but they're not the educational professionals. It's a two-way street, counsel. It's a two-way street. And the record shows that it was a two-way street. What you seem to be suggesting is that the parents have to receive from the school district some kind of a psychiatric determination in specific terms saying, we've identified that your child has X, therefore she's entitled to Y. But they talked about what was to be done. The parents put the child in a private school before, had treatments, had the doctors, or she was hospitalized. They were deeply concerned about her. But it seems to me there's a disconnect here. It seems like you're saying, yes, they had an obligation to notify what they did know, but it seems like there was. There was an iteration back and forth, and a time period well past when your people brought this claim, did they not? They knew about this before. They knew she had problems. Again, they did not know that she could be evaluated under IDEA. The school district knew that she could. The school district is charged with the duty, a far-reaching duty, to identify students and to evaluate. And that's when that would have been determined. I know you're at your rebuttal, Mark, but I do have a question. So looking at this now, they filed in 2014, correct? Correct. Okay. So there's a two-year statute of limitations, so we go back to 2012. Correct. Okay. And so from 2012, assuming that there's no way to push the statute of limitations beyond that, because it seems like there would have been an in 2009, or when she was in the sixth grade. I think I'm confusing the dates. Okay. But nothing happened. Nothing was filed. And if something had been filed before then, I think we might be looking at this quite differently. But we have to look back now, so within the last two years, because I'm not quite sure how the statute of limitations affected. That's why we asked for the briefing, and I'm not quite sure that has been answered here today. But from 2012 to 2014, are you maintaining that there was a violation of the child fine from that time period? Yes. From in 2012 until February 2013, when she was evaluated and provided an IEP, that was also a violation of child fine. What should the school district have done in 2012 that they didn't do here that would have, in your view, not made them violate the child fine? They should have evaluated her for IDEA immediately, and when they conducted the evaluation, they should have looked in their own records. They didn't even ask the middle school staff for any reports about her. So these brand new staff immediately did their obligation in seeking an evaluation, but they didn't seek an IDEA evaluation, and that's very different. And if a child is eligible for IDEA services, then that's what they need to receive. Isn't there an argument, just to follow on that point, that what the district was doing was there was a 504 evaluation, they had learned of her mood disorders, they're recommending for the CCST treatment, for CSCT program. Isn't that all part of the identification process? Because doesn't the district have an argument that we're trying to determine whether there should be an IDEA evaluation during that time frame? Well, Your Honor, no, because the school district doesn't get to choose which law it wants to apply, and IDEA offers a lot more protection than Section 504 does. But the student has to be identified first to determine whether IDEA applies, and isn't this part of the identification process? The evaluation is what identifies the student, and it is part of that process, but you don't know if a student qualifies for IDEA until you do the Section 504. A medical diagnosis is enough. Agreed, but didn't you just conflate evaluation with identification? Aren't they separate processes or procedures? No, they're not. If you look in the Federal Register, the explanation from the U.S. Department of Education is that's all one process. You want to save balance of your time? It's up to you, but... Yes, Your Honor, I'll save the balance. Very well. So let's hear from the school district. We might be the shortest people both ever to be here for a while. May it please the Court. Good morning, Your Honors. My name is Elizabeth Culliva, and I'm here today to represent the Missoula County Public Schools. The case you have in front of you today is complicated, and it goes, it stretches over a longer period of time. What I'd like to focus on today is clearly obvious, the arguments with the statute of limitations and child find, and address the actions of the Missoula County Public Schools. I think it's important to understand the complications in this case, though. And it's going to be hard for me to actually say the students' names. I'm still going to say KKR, because that's what I've been calling her for years. KKR came to Missoula County Public Schools as a sixth grader after spending the first six or seven years of her educational history in a private school in Missoula, Montana. This particular school is unstructured, doesn't offer grades, and doesn't provide special education. During the time of her attendance in this school, KKR's parents had her evaluated several times, and those evaluations identified issues that KKR was struggling with, and also made recommendations for school. Had her evaluated privately? Yes. Okay, go proceed. Those evaluations made recommendations for KKR in a school setting. Nevertheless, the parents kept her in the unstructured private school that did not offer special education or related services. In the sixth grade, due to issues related to her brother and unrelated to KKR, KKR and her brother were both moved to the public school system in Missoula, Montana. At that time, district staff knew that KKR's father had recently and tragically been murdered, and that that had profoundly affected her, and that she was suffering from grief. Missoula County Public Schools testified they were unaware at the time she entered school that she had other diagnoses. And the testimony on the record from the parents was that they did not provide the private evaluations to the school at that time. When she started sixth grade, KKR struggled moving from an unstructured environment to a structured environment. That's not uncommon for students who don't have the experience of going through a structured public school environment. Nevertheless, the school worked with KKR, and during the course of that year, worked with her to identify some issues and gave her additional help, all general education interventions that were available to other students as well. At the end of her sixth grade year, KKR wrote a note to a friend who was leaving Meadow Hill, graduating and going on to ninth grade, that expressed suicidal ideation. That note was turned over to a school counselor who informed the parents, and KKR was, at that time, briefly hospitalized. And that was in 2010? That was in 2010. So that's the 2009-2010 school year. This was at the end of the school year, though. Keep in mind, this is the end of May, beginning of June. School in Missoula gets out in the beginning, the middle of June. When KKR returned to Meadow Hill in the fall, her grades improved, her behavior had improved. The district at that time, and consistently, the staff testified that they did not see her as a student who was in need of special education. Identification is the real key issue here. In order to identify a student, to determine whether they're eligible for special education, school staff has to have reason to suspect that she has a qualifying disability and is in need of special education and or related services due to that disability. I think our president established that this duty is triggered when a disability is suspected, when the district has noticed that the child has displayed symptoms of that disability, and the IDEA defines disability to include serious emotional disturbance. It does, but, Your Honor, that's two parts. If you look at the federal statute, it specifically states that you have to have to suspect the disability and believe the student needs special education in order to address that disability. In this case, the staff uniformly testified that they did not believe that KKR was a student in need of special education. Even after they were aware that she was hospitalized for a suicide attempt? Suicidal ideation alone, Your Honor, is not enough to say the student is in need of special education. Doesn't it raise the specter of suspicion of a serious emotional disturbance? It would raise the question of whether or not the student, school should have considered under Section 504, whether the student had a disability that substantially limited a major life activity. That's a completely separate program, completely separate statute, and it's not the subject of this complaint. The appellant, in her supplemental brief, raises at page five, seven factors that the school district was aware of, including suicidal ideation, hospitalization, psychiatric hospitalization for five days, the diagnoses, chronically absent, and those types of things. If the school district was on notice of that, isn't that sufficient to start the IDEA process? The school staff didn't believe so, Your Honor, and I'll tell you why. Because during the sixth grade, she was experiencing what they would consider to be the normal struggles that a student coming from an unstructured to a structured program. She improved in the seventh grade. She was able to pass her classes. She did have absences, but they weren't an excessive number of absences. She did not have the kind of behavioral issues that would have triggered some concern about her ability to benefit from the educational program. Even in light of our recent decision in L.J.? Yes, Your Honor, because I think you can look at L.J., and the facts are completely distinguishable. Specifically in L.J. I have to put my glasses on to read this. In that case, the student had already been identified, and the issue truly had to do with evaluation, whether the student was eligible, excuse me. In that case, there were very specific and very difficult behaviors that the student was demonstrating in school. Those behaviors did not exist in this case. And in L.J., the student was being provided specialized instruction that was not available to the general ed students. That did not happen in KKR's middle school experience. She was provided with general education interventions. For example, she was referred to the CSCT program, and counsel discussed the CSCT program in her briefing. But what she didn't tell you is that under Montana administrative rules specifically, it is recognized that a student can be eligible for CSCT mental health services not be a student with an IDEA qualifying disability. The regulations, in fact, require schools to collaborate with IEP teams if the student has an IEP, clearly recognizing that there are many students who qualify for CSCT, but do not qualify for services under IDEA. Grief, for example, is one of the issues that students get referred to CSCT for. Grief in and of itself is not a qualifying disability under IDEA. This is in the case of the fathers. Pardon me? This is in the fathers. Absolutely. Let's just, given the benefit of the doubt here to the parents or to KKR, let's assume that what did trigger the trial fine. What happens to the statute of limitations here? That turns in on the issue of whether the parents knew or should have known the issues. The hearing officer, and granted this was a 15-day hearing, we had a great deal of testimony about what the parents knew or should have known. He made very specific findings based on testimony. Let me be more clear. Let's say that the school should have known based on the hospitalization. I know you disagree with that, but just assuming that the school should have known and that triggered their trial fine obligations. Did the parents need to bring that lawsuit then within two years? Absolutely. And if they didn't, what happens? It means that they waive their right to have a lawsuit regarding those years. And what's your authority for that? Because the statute of limitations, especially if you look at the Avila case, it specifically talks about what the statute of limitations is. And it's a question of when they knew or should have known of the injuries. And if they don't file something within that time period, then they are barred by the statute of limitations from going forward. And what about the argument that the parents make regarding the 11th Circuit case that how could they know when the school didn't know? Okay, and I think we're referring to Draper? Draper. And in that case, again, that was not an identification case. It was an evaluation case. And that case looked at what kind of specialized knowledge is necessary for a picture to truly require that a parent knew or should have known. In that case, they were looking at whether or not the district's evaluations were appropriate, whether or not the recommendations for placement were appropriate. That is absolutely not the case here. The case here is whether the parents knew of the disabilities to the child. And that was established through testimony that they absolutely were aware of it. And second, were they aware of special education? The mother testified during the hearing that she was aware of special education. She grew up with it in the schools. She'd read the school's handbook regarding special education. No specialized knowledge is needed for the identification portion. There is no argument that there was no evaluation. There wasn't an argument over whether the district's evaluation was appropriate because we hadn't gotten that far. We were still in the identification phase. The cases that were cited by counsel in their brief, so it would be Draper and Somoza, are clearly evaluation cases, not identification. And the law does recognize them as two separate processes. So Avila is your best case on the statute of limitations and what the parents needed to do? Yes. So from the district's perspective, whether the district failed to comply with its child find obligations, the parents are charged with knowing what's going on with the child. And they clearly did here.  Not whether the district has notified them of IDEA processes being available. When you look at the new or should have known standard, it's a factual determination. And the hearing officer went through this carefully of what did the parents know? When were they aware of their injury? The hearing officer found and the district court affirmed that the parents were aware of these issues related to their child, certainly in 2009. But if you want to look at the 2010 date when the first hospitalization happened, even if you use that date, that still gets us to the 2012 new or should have known date. And what was happening in 2012 with your school district? Okay. In 2012, KKR transferred. She went from eighth grade to her freshman year of high school. The testimony indicated that she was moving from the middle school to what's known in Missoula as the Health and Science Academy. It's a small program located within the high school that focuses on health and science programming. It's academically very rigorous. It's not unusual for students to struggle in that intense, rigorous program immediately. The staff was concerned about KKR immediately. And there is testimony from the mother that the issues that KKR was experiencing were manifesting themselves differently than they ever had before. The staff immediately determined that they would seek consent to evaluate to see if she had a disability that was substantially limiting a major life activity. They performed their 504 evaluation. At this time, saw the prior diagnoses from doctors because they were provided by the parents at that point to the school. She was qualified for services under Section 504. She was immediately served under Section 504. And within, I want to say, four months, she was also then referred for an evaluation under IDEA because school staff at that time determined that they expressed a concern that she was in need of special education services. They conducted that evaluation, found that she was eligible for services under IDEA and began serving her immediately. Although the statute of limitations may bar the plaintiff's claim prior to October 2012, the statute doesn't wipe out the school district's knowledge. So it comes with that knowledge from sixth grade, seventh grade, et cetera, et cetera. So shouldn't we be charging them in October 12 with immediately at that point putting her into an IDEA evaluation because they've got the base of knowledge? Only if there was a reason to suspect that she needed special education-related services because of her qualifying disability. And again, the staff testified that they did not believe that immediately when she came into in October of 2012. That wasn't their immediate concern. When did they get the diagnosis? You said the parents provided it to them. They provided the diagnosis around October of 2012. Shouldn't that have triggered it right then? No, not necessarily. There are a multitude of cases that talk about the issue that a diagnosis alone isn't enough to trigger an IDEA evaluation. It has to be read in conjunction with there's a qualifying disability and the student is in need of special education-related services. The federal statute has that two-part requirement. I think what you're being asked to do is get rid of the second part of it, which would be any time the school suspects a disability, it's required to do a full-blown IDEA evaluation. And that's not what the federal statute said and that's not the way the courts have that statute. Again, this is identification only, not evaluation. The bar for evaluation is much lower. Once a student has been identified and the school has determined that they suspect disability and the student needs special education-related services, when you look at the cases that discuss evaluation at that point, and that would be the Timothy O case, absolutely the bar is lower. At that point, any time the district suspects a disability, they have an obligation to perform a comprehensive evaluation and evaluate the student in all areas of suspected disability. I semi-accused plaintiff's counsel or appellant's counsel of conflating identification and evaluation. She said, in a sense, they're related. How are they? Tell me how they're different. They're different because they're different because it's two different steps in the process. Identification is the initial process where either the parents or the school state, I The evaluation is where the school or private individual conducts an evaluation to determine what is the disability that this student has. What factors go into the identification that are different, in a sense, from the evaluation? Is it simply saying, I think my child has the need for this and that's enough for identification? Or does the school district have to do some evaluation of that for identification? Before they get to that point, simply saying, I think my child has a disability does not trigger a need to evaluate under IDEA. The cases are clear on that. It has to be read in conjunction with the second half of the statement in Title 20 that says it has to be the concern of a disability and in need of special education. If it's disability alone, there's a mechanism for that under Section 504. I guess what does it mean when that second part of need of special education, what does that, how does that in practical sense play out? It would mean the student needed specialized instruction in order to access the district's educational programs due to their disability. So what does the school have to look at and how long is a reasonable time for the school to make that second prong determination? The school usually employs general ed interventions. It can be anything from student assistance teams. It can be working, observing the student informally. There are a lot of interventions that different schools work with students, and it's depending on grade level. So, for example, in Katie's grade level, general ed interventions at sixth grade were a Saturday school program that was completely voluntary for students that wanted to work extra time. All of those are general ed interventions. And then when does it flip over then to evaluation to the lower bar? When a staff member or parent raises a concern that the student needs specialized instruction in order to access the educational program. Teacher or parent? A teacher or a parent. And that's where your statute of limitations argument comes in under OVILA, right? Yes. But that idea of whether they need specialized instruction or need special education or related services, that has to be a determination made before the student is actually referred for the evaluation. And in this case, school staff testified uniformly that prior to when they referred her for her special ed evaluation in the later fall of 2012, they did not believe she needed, at that point, specialized instruction or any related services. Even after the hospitalization for suicide? In the sixth grade? Yes. Apparently, there was a ninth grade hospitalization as well? That was actually the beginning of 10th grade. And the 10th grade hospitalization was she came back for her sophomore year. She started engaging in risky behaviors and smoking marijuana at the end of her freshman year. That increased dramatically over the course of the summer. And there were also some very significant home life stressors going on within the family. School starts back up in September of 2013. In September of 2013, within that first month of school, the student was removed by her parents and hospitalized. She never returned to public school after that. But there was a request that the school pay for the private school to which she was sent afterwards? Long after that, there was a request during the IEP process. So by the time for the second hospitalization in 2013, she'd already been identified as a student with special ed. She'd already been determined to be a student who required specialized instruction. Other questions? I still struggle with what was missing between October 2012 and I think it was January 2013 when they finally say we're going to do an IDA evaluation. What was missing in October 2012 that says the school district doesn't have to identify her as such and then all of a sudden it exists in January 2013, four months later? Okay. Because when they became aware of the different mental health diagnoses that the student was experiencing, they were also aware that she was struggling in the new placement that she was in, which was the Health Science Academy, which is more rigorous. At that point, they didn't have enough information to determine that she immediately needed specialized instruction. At the time, they were treating it as a 504 issue of does she need accommodations for her mental health conditions? Which if you look at 504 definition, it's a physical or mental impairment that substantially limits a major life activity. And then once you reach that determination, accommodations for that student are developed and proposed. At that time, the staff believed that what she needed were accommodations and they developed those immediately for her. Other questions? Thank you, Counsel. So, we have some rebuttal time. Thank you, Your Honor. First of all, it's incorrect to say that identification comes before evaluation. The express purpose in the statute for an evaluation is to determine if the student needs special education and related services. And I will get you that Federal Register site today that says that it's all part of the same process and the threshold for suspicion is very low. Just a couple points quickly. The need for specialized services doesn't, it was established in seventh grade, the school referred her for individualized counseling. That CSCT program, you don't have to be a special ed student, but it is individualized counseling to meet a student's individual needs. And the record is replete with the school's awareness of this. In seventh grade, she was still absent a lot. More than double what the school considered chronically absent. There's extrinsic evidence in the record that contradicts the hearing officer's findings and the subjective retrospective testimony of the staff. And a couple points real quick about the CSCT services and the IEP. The IEP is fatally flawed, the one in 2014. Everyone, absolutely everyone agreed that she needed psychological counseling to benefit from her education. That is not part of her IEP. The school said, well, she can get CSCT services, but then the special ed director deliberately misled the parents and did not tell them that CSCT services had a waiting list and would not be available to her. And had they put the CSCT services in the IEP, then the school would have been financially responsible for those if the parents couldn't afford to pay. And so this court's precedent is so clear, Union School District and others, that the IEP has to include everything. It's a formal written offer. And related services specifically need to include the frequency, the duration, and the start date. Counseling services were not in there. Their own expert said that she needed those. Their own expert said it didn't have a behavior plan, and a behavior plan was vital to her success. Their expert said, yes, there were some goals missing from her IEP, but he assumed they would be addressed in therapy. There was no therapy in the IEP. And this is a child who had just come from a residential treatment center. The parents did not place her immediately after that psychiatric hospitalization. She went to a center that had a school and residential treatment, and that was the best that she had ever done. And she actually started to achieve closer to her potential. So they begged the school to please replicate, provide mental health supports. The IEP does not have that. It's a fatal IEP. The parents were justified in placing her in that placement. They could only afford it for a year. When she was out of that placement, they moved. She went to a very small charter high school with a rigorous college preparation program. She graduated with a 3.3 GPA. She was down below a 2 point when she was in Montana County Public Schools. Efforts don't count, Your Honor. It's action that counts. It's following the law that counts. And that's what Missoula County Public Schools did not do. I know they professed in the hearing about how hard they were working, but the IEP was totally inadequate. So we do request that you remand this for a remedy hearing to determine appropriate compensatory education, and that you order reimbursement for the placement in Maple Lake Academy. The Avila case is very supportive of our position. Those cases that the Ninth Circuit relied on, one of them, DeMarcus, is a child fine case. And they consistently say, yeah, the parents knew what was going on. The parents knew the child wasn't progressing, but it wasn't until later when they found out the actual educational disability or poor programming that they had the requisite knowledge. And in those cases, most of those parents except DeMarcus had received procedural safeguards. They had been in the system. These parents didn't receive procedural safeguards. They did notify the school in 6th grade and 7th grade, 8th grade, and 9th grade of her psychiatric conditions. Let me ask you this. You're a very effective lawyer. I respect that. But there was, I think, a 15-day hearing before an administrative law judge who went through it. You made all these arguments there. The district court had not as long, but nonetheless, a review of what had happened in the other hearing. Lots and lots of due process here. Honest people can disagree on how they perceive things. You are essentially telling us that we should ignore the administrative law judge and the district judge with regard to the facts, and that we should interpret them in the way that you have suggested. How do we do that? What standard do we use for review here? It's some deference, but it's a de novo decision for mixed questions of fact and law. The legal is, but not the facts, right? That's correct, not the facts. But in my brief, I pointed out where there was clear error in the facts. The hearing officer found that no, Mary Archer, the counselor, was never informed of her nonverbal learning impairment, had never been requested to get a 504, and yet her own notes show that she was. In her notes, she says 504, nonverbal learning impairment. The record, this court has said you cannot give blind deference to the hearing officer. The hearing officer ignored extrinsic evidence, and in the record, that contradicted testimony of those witnesses. Again, with respect, counsel, as you know, when human beings disagree, and they come into a court or some kind of a proceeding, sometimes you get diametrically opposed perspectives, and what is hopefully a neutral person looks at it, or a jury looks at it, and makes a determination who they think is accurate. In this particular case, the ALJ felt that this district was accurate in most of these points. I know you disagree with that, but I'm simply saying that, to say that, you know, basically there's clear error. I don't find anything in the record, perhaps you can cite me some, where there is clear error on the facts that go to the, for example, the child find issue. Yes, Your Honor, there's clear error in the fact that they testified she didn't request a 504. The record has documentation of that. There's clear error that they testified they didn't know of her psychiatric diagnoses. There is a fax in their records from her psychiatrist with those psychiatric diagnoses. The same with the nonverbal learning impairment. The hearing officer, frankly, ignored extrinsic evidence, and I can't say everything I think about the hearing officer, but it was his first and last special education hearing, and I think it's... I think we're well over time, but let me ask my colleagues, does anyone have any additional? We thank you, counsel, and counsel for the school district. I know these are very emotional cases. We were dealing with a human being here. We express our empathy for KKR. We hope she will do well in her, the rest of her life. We will do our best to apply the law as we understand it, and we thank you for your argument. The case just argued is submitted, and the court stands adjourned for the week. Thank you, Your Honor.
judges: M. Smith, Murguia, Gordon